Good morning, Counsel. My name is John Lambrose. I'm here on behalf of the Petitioner Appellant, Mr. Frank Matylinsky. I'd like to reserve about two minutes of my time for rebuttal if I can. Okay. I'd like to begin with the claims that survived the merit or, excuse me, survived the procedural defaults. And I think the way to approach that would be to just sort of reacquaint the Court with some fundamental procedural things that occurred in this case. First of all, the key decision with regard to the deference that's owed to the State court final decision with regard to the merits claims comes at pages 12 through 25 of the excerpts. And that's the State district court finding of fact, trial court findings of fact, conclusions of law and judgment, because the Nevada Supreme Court's affirmance was a summary affirmance. The lower court, the Federal district court in this case, really did not provide much analysis in his decision, either other than to defer completely to that decision. So really, the upshot is, the rub, if you will, is whether or not that decision was contrary to or an objectively unreasonable application of Strickland or resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented. And my position is that it was both. That decision by the State district court constituted both violations of the 2254D1 and 2. And this is the determination by the trial judge who actually saw the performance of Mr. Madelinsky's former trial attorney at trial. Yes. It was. Okay. Judge Breen. He conducted the evidentiary, the two-day evidentiary hearing on the State post-conviction petition, during which So he both presided over the trial and the habeas evidentiary hearing. Yes, he did. On the Strickland claim. Yes. And we've got findings of fact from the State court as a result of that hearing that Mr. Madelinsky now has the burden under AEDPA of showing are erroneous by clear and convincing evidence. Exactly. Okay. So what clear and convincing evidence do you have to rebut the deference that AEDPA requires that we otherwise accord to those factual findings? I think there's a predicate answer to that, and that is, first of all, I don't believe that the decision, Judge Breen's decision in this case, deserves any deference for two reasons. Number one, the findings of fact that he made with regard to the deficiency problem of Strickland, and that was whether or not trial counsel's acts of omission and failures to or, excuse me, and commission, some things he did and did not do during the trial, were predicated on his, Judge Breen, just sort of pulling it out of thin air. He made several decisions with regard to deficient performance based on tactics and strategy. But, counsel, that's why I asked the questions I asked of you earlier. It seems to me that there, that would be a much stronger argument if a different judge who had not watched the performance of the lawyer was making that assessment. But here we have the advantage of the jurist who presided over the actual conduct of the trial, who watched this lawyer and knows things that not even the record, a cold transcript can tell us. And if I understand anything about AEDPA, it is that I've got to give a substantial amount of deference to that factual determination. So it seems to me you've got a heavy burden coming in here saying that the judge erred. What evidence do you have to meet the high AEDPA threshold that his factual findings are wrong? If you focus on the April 1987 evidentiary hearing, the key point, the point that I'm doing very artfully, but hopefully I can help you out. Well, maybe I just am misunderstanding it. Trial counsel did not testify at that evidentiary hearing. So what you had was the trial judge, admittedly, Judge Tallman, he was he knew the atmospherics. He could understand, you know, just by watching the trial maybe, and then infer from that why some decisions were and were not made. But he could not pull out of whole cloth a finding that it was a tactical decision not to present evidence at the Jackson v. Deno hearing. Do we know whether it was or not? Pardon me? Do we know whether it was tactical or not? No, we don't, because Mr. Acheson, trial counsel, didn't testify. Is he dead? No. He was very much alive in 1987, and he is, at least he was a few months ago. Nobody got an affidavit from him? Nobody got an affidavit. Nobody got anything from him. And quite frankly he's Whose burden is that on habeas? Well, I believe it's the State's burden if they want to show that the decisions you know, the State, I think, if the State wants to defend a Strickland claim, then the State needs to show that the performance of counsel was not deficient and that there was no prejudice. So what on decisions that the trial judge said, I understand why trial counsel did that. That was tactical. What we have is the trial judge's observations of the trial and his inferences or conclusions drawn from that. We don't have a statement one way or the other from the actual trial defense. Absolutely. And I think one key, one key claim is nobody, except for Mr. Madelinsky, who testified at length at the evidentiary hearing, nobody talked about why it was testified at this trial in your own behalf. Now, that's not Mr. Atchison's decision. Does the trial record show that Mr. Madelinsky was questioned by the trial judge as to whether or not he wished to testify? You know, Judge, there was nothing, and I hope I'm accurate about this because I combed it last week, there is nothing in the trial record where the trial judge advised him of his right to testify or not testify. What did happen just before Mr. Atchison, defense trial attorney, gave his closing argument, the judge did ask Mr. Atchison if he wanted a jury instruction on Mr. Madelinsky's on the fact that he does not have to testify. But there never was, at least that I could find in the record, and maybe Ms. Crow, maybe Ms. Crow could find it, but I couldn't, there never was an admonishment to the defendant that I could find that said you can or cannot testify in this. And as we all know, and as I briefed in my opening brief and in my reply brief, that's not counsel's decision under Jones v. Wood. That's Mr. Madelinsky's decision. That's why I asked that question. And that's a compelling, in a way, I think that's a good response, if you will, to your question about the atmosphere, the judge sat through a two-week trial and that kind of thing. Did Mr. Madelinsky testify at the post-conviction hearing that nobody ever told him that he had a right to testify? Yes. He testified at the post-conviction hearing that Mr. Atchison said that basically you're not going to testify. I'm not going to testify. That's a different answer. Oh, I'm sorry. Let me go. That wasn't the question. I'm sorry. Did Mr. Madelinsky testify at the post-conviction hearing that nobody ever told him that it was his right to testify if he wanted to? I'm going to say that I think he did. I'm not positive, but my recollection, I have my notes here if you wanted me to, if I could look at those real quickly. Sure. Okay. Again, can I get your question again? Yeah, I just wanted to know whether or not he testified at the post-conviction hearing that he was never informed of his right to testify. No, he didn't. But what happened was, and this is at the Respondent's Excerpts of Record 1043 through 1047, he testified at length about discussions that he had with trial counsel about his right to testify, and trial counsel told him you're not going to testify because if you testify, then bad act evidence is going to come in. Well, what Mr. Madelinsky said from the stand during that evidentiary hearing was the bad act evidence already came in, in the case in chief, and that's why he was motivated to testify at trial. Was the what in that respect was trial defense counsel referring to the evidence of these crimes or something else? The evidence of two prior incidents, a May 1983 incident and an October 1983 incident. So incidents were already in the record. Yeah. They were already they came in in the prosecution's case in chief. They were challenged. There was a motion to eliminate that was denied. But doesn't his criminal record go beyond those two domestic violence acts? Maybe I'm confusing the facts here because we have so many of these cases in a week, but didn't he have a prior armed robbery conviction or some kind of an assault? I don't think it was an armed robbery conviction. I don't believe that because he would have definitely done prison time for that. I think there may have been a prior conviction, but I think it might have been battery related or something like that. But wouldn't that have come in if his defense theory was I didn't do it, and he got on the witness stand and the evidence of the two prior acts of domestic violence were somehow admissible, wouldn't the other battery come in as well? But see, Judge, yes, it would have. But I don't think that's what motivated. First of all, let me back up again. His trial defense was not I didn't do it. It wasn't first-degree murder. I did not act with premeditation and deliberation. It was a second-degree murder case. And, you know, just for the sake of discussion here, I think it's important that the Court know, and it's something I picked up during preparation last week, was that the jury deliberated in this case the guilt phase for over 10 hours. Well, but he was facing the death penalty. Well, but that was the guilt phase. Oh, guilt. See, they were deliberating first- and second-degree murder at that point, and that's found at the region. But you said this was a two-week trial?  I think it was probably about six trial days. Okay. So they were out 10 hours? They were out 10 hours. Yeah. They were out 10 hours on first- and second-degree murder. And I think that's compelling. I think that's compelling because, really, the evidence that the prosecution's theme was he did it because he's done it before. He beat her. He killed her because he's beat her before, the bad act evidence. He made all these crazy, you know, false exculpatory statements during his Miranda -- during the interrogation, which was one of my Miranda issues that I have. And the third one was, you know, the Dean Kennedy's statement that he made to this inmate, Snitch. So, really, that didn't take long to put that proof on. And so what I'm saying is the jury really must have, somebody on that jury, okay? I'm not saying it was six to six or anything like that, but it may have been one holdout. I don't know. But somebody on that jury was talking about second-degree murder because it doesn't take 10 hours to deliberate this case in a particular way in Reno, Nevada. But you've got two victims, though, too, do you not? Yes. There was a fetus. So you've got the fetus issue. But you know what? Both counsel in closing argument gave that up. If you look at the closings, both counsels came out of the bench, came right out shooting, saying, this is all about premeditation and deliberation. Yeah, but I guess where I was going with the question was, and I don't want to waste your time because this is arguing what happened inside the black box, and neither one of us can ever know. I brought it up. And you did. But I mean, it just seems to me that I could see a jury getting hung up on whether or not in the course of, you know, beating his wife severely, you know, that he ever would have intended to kill his soon-to-be-born child. I could see a difference. And I think if you read the closing arguments, that might dispel that notion. And my reason for bringing it up and also bringing up the fact that it took them six hours to deliberate penalty, I don't think death was ever on the table with this case, but they were locked between life without and life with because it took them so long to reach first-degree murder. My point is that deficient performance, I think, and I don't want to spend too much time because I do want to talk about default, but the deficient performance is clear because Acheson never testified and Judge Breen could not, and could not at the level. Sotomayor, counsel, under Strickland, the burden is on the claimant to show both deviation from accepted standards of lawyering and second prejudice. Now, doesn't that burden include the burden of obtaining a statement from the attorney? Isn't it the claimant's obligation as part of his showing deviation from good lawyering to show that it wasn't tactical? Well, Judge Singleton, I think that's a great question, and I've done a lot of Strickland hearings in my day where I've had to put evidence of that on, and there have been many times, many times, where I have intentionally not called trial counsel because I knew trial counsel would hurt me. And I think that's what happened here. Why put a witness on the stand that's going to get up there and say everything was tactical and strategic? So you have a ready answer when an appellate judge asks you why you didn't. Well, it wasn't me. All I can say is I don't know what was in Mr. Wishart's mind, okay? I honestly do not know. I was answering from a hypothetical perspective. And in all candor to this Court, I'm not suggesting that Acheson was going to say things that were going to hurt Mr. Madelinsky. I don't know that. But I'm giving you an example of where you would not call trial, where you would not call trial counsel. If that being the case, then, and let's speak hypothetically, what would prevent the finder of fact in a post-conviction proceeding from fully analyzing a Strickland claim, even in the absence of testimony or affidavits from former trial counsel? Well, I think one thing that would prevent it would be the case law in this circuit, the Alcala v. Woodford case, where at 334-Fed-3, 862-871, and I quote from this Court, this Court cannot assume facts not in the record in order to manufacture a reasonable strategic decision for the Petitioner's trial counsel. Well, I'm not sure that addresses my question. My question is, in the absence of, let's assume that the reason that counsel was not called was because he had nothing helpful to say to Mr. Madelinsky. I don't know of any case law in this circuit that says that you cannot make a Strickland evaluation on the basis of other evidence in the case without any testimony from the trial lawyer. I would agree with that. I think, I think if, you know, say there was an in limine hearing on bad act evidence, and trial counsel said something to the effect that, you know, I'm not going to challenge this because this bad act evidence could help, could cut my way. You know, that's why I'm not challenging it, or something like that. Where it's evident from the record that a tactic or decision was made by trial counsel. Take as an example. And that didn't happen here. Well, take as an example in this case the decision not to admit the blood sample or, you know, to pursue the intoxication test. Right. Where the trial judge said, you know, the defense here was I was so drunk that I really didn't know what I was doing, and therefore I couldn't premeditate and intend a first-degree murder to kill her. But the tests don't help. He got good the trial counsel got good testimony from friends who were drinking with him beforehand about how much he'd consumed and so on. And why can't the trial judge on that issue without regard to the defense counsel's testimony conclude there was no Strickland error here because this test would have hurt Mr. Madelinsky more than it would have helped him. It had to be a strategic reason. Yeah. I think with that particular claim, I wouldn't have any problem conceding that point, but that's not what I would call one of my big five I concede claims. No, no, no. I understand. I'm still trying to tease out your position here that there had to have been error in the manner in which the trial judge reached his Strickland conclusions because we never heard from the trial lawyer, and I just don't think that's the law. Well, let me give you five examples where I think he had to hear from the trial counsel. Okay. The trial counsel's failure to properly limit and rebut the scope of the bad act evidence by calling additional character witnesses or doing further investigation. Counsel's failure to fully and completely ---- Did he call any witnesses at all, character witnesses? He called he didn't call McMinn and Miller, the two character witnesses that would have been able to explain. But did he call ---- was there any character evidence introduced in the defense case in Chief? Let me just check that. I don't want to say no. I thought I remember reading from the trial court's post-conviction findings that there was character evidence offered, but that additional character evidence would have been cumulative. He did. I think that the fact that he called his sister could be deemed character evidence. She wasn't a precipient witness. No, she wasn't. But what she was doing was sort of talking about his childhood with alcoholic parents and talking about the fact that he was, you know, just an awful alcoholic and addict himself and that kind of thing. So whether or not it ---- you know, the character witnesses I'm talking about are McMinn and Miller. Sure. They would have been able to talk more about what kind of a man he was. The failure to fully and completely develop the intoxication defense by calling Dr. Chappell. The failure to properly investigate that Dean Kennedy guy. I mean, my God, there was so much evidence against him that Acheson didn't get. Well, let's go back to the intoxication ---- Well, go ahead and finish your list here, because then you're right. The failure to really, really challenge the Miranda waiver. You know, he was at like a .150 when he waived. And the failure to allow the defendant to exercise his right to testify. I think those acts of omission and commission are the kinds of things that you need to hear from trial counsel on. And I don't think, with all due respect to Judge Singleton, I don't think that that's the Petitioner's obligation in a Strickland case. If he can prove it by testifying himself. You know, the State can then call counsel and say, wait a second. Let me tell you exactly what happened. Because the attorney-client privilege is waived. You know, he can defend on every point that Petitioner makes. And I don't ---- We'll give you a little bit of time for rebuttal. Okay. I guess I'll submit the default argument on the briefing. Thank you very much. Thank you, counsel. Good morning, Your Honors. Good morning. May it please the Court. My name is Amy Crowe. I'm a Deputy Attorney General with the Nevada Attorney General's Office here on behalf of Michael Budge, Respondent, Appellees. First off, as a point of clarification, Mr. Madelinsky indicated that the Court's post-conviction court's findings of fact was on page 12 through 25 of the excerpts of record. There are actually two orders, so it's actually page 1 through 25. I think regardless of, you know, I believe that under Strickland, it is Madelinsky's responsibility to show that his counsel was unreasonable. But take that aside. Judge Green found that there was no way Mr. Madelinsky could show prejudice. In this, he noted that Mr. Madelinsky savagely beat his wife, Peggy, and the 7-month-old fetus she was carrying to death. Evidence showed the beating was one of great duration, occurring in several rooms of the house, indicating that Mr. Madelinsky pursued Peggy. She suffered as many as 40 blows to her head alone, resulting in swelling of 80 percent of her brain, and 95 percent of her back, what was black and blue, appearing to have been administered by kicking from the defendant's shoe. Her breast showed signs of being bitten. There were blood spatters and parts of her hair and scalp throughout the house. Ultimately, it was a very prolonged and savage beating, and under these circumstances, Judge Green indicated that Mr. Madelinsky could not establish the prejudice prong of Strickland. And certainly for this murder, the State sought the death penalty. The strategy of the defense, which was clearly apparent throughout the trial, was to show that Madelinsky was drinking over some measurable period of time, did not remember the beating, was too intoxicated to have premeditated the crime. And, you know, the strategy of the counsel worked to the extent that he was not sentenced to death. With regards to some of the particular issues of Dean Kennedy not having properly investigating Dean Kennedy, his counsel did, in fact, bring several rebuttal from Lonnie Muster, who testified that he did not hear that Madelinsky made statements regarding Madelinsky saying that his wife had it coming to her. He indicated that Mr. Kennedy would – Lonnie Muster indicated that Kennedy would have done anything to get out of the detention center, and Muster had indicated that he had no prior felonies, while Kennedy admitted to having at least two prior felonies and was, in fact, again in prison. Judge Breen found that Kennedy was asked if he had been promised or given anything, and at the post-conviction counsel, it was not shown that he received any further concessions. With that respect, as for, you know, not bringing in rebuttal testimony, there was already, you know, multiple witnesses who had testified, Mardeen Hamaker, that Madelinsky was passive and Peggy was argumentative and got her licks in as well. Brad Byington, Peggy appeared to wear the pants in the family and could be ornery, and asked Madelinsky if he was sure about marrying Peggy. And a lot of the – in terms of the bad acts, you know, those – that was brought in by the other testimony of Craigs Road, Marlee Hunton, and Mardeen Hamaker. In terms of the right to testify, Madelinsky acknowledged before trial that – or at least acknowledged in his post – in the post-conviction evidentiary hearing that he spoke to counsel before trial and spoke to counsel during trial, and at both times, his counsel did not want him to testify. And one of those reasons was his prior convictions. He had two prior felonies that they were concerned about being brought in. And this was also indicated in his first State habeas petition. He raises – raised the claim that counsel was ineffective for not letting him testify because of the prior convictions, because Mr. Madelinsky believed the prior convictions were inadequate. What were the two prior crimes? I believe they were actually drug-related. One was LSD, and I'm not certain what the other one was. If there were misdemeanors beyond that in terms of violent crimes, I do recall something about a burglary, but the two felonies were drug-related. And then what about – was there some sort of a crime of violence, a battery or something? Yeah, I got – and I cannot say where it was on the record, but I got the sense that there may have been a burglary in the past. No, there was no charges in terms of batteries. In terms of the time that they were chopping wood in the – in California, Peggy did not want to press charges against Mr. Madelinsky, so the police let that one go. So there is only a police record as to talking about it. That was the prior incident that had sent her to the hospital in March? She did not go to the hospital on that one. The prior incident was a time when they had gotten into an argument, and according to one of the neighbors, Peggy had said she got her licks in as well. And I believe that was the time that she went to the hospital. Her face was black and blue. In terms of the procedural bars, I would just like to note that below the argument in terms of the procedural bar was in regards to independency and adequacy. on appeal, Mr. Madelinsky argues that the second post-conviction petition or second post-conviction hearing was inadequate because it only lasted 14 days. And he also argues that the third post-conviction petition was in – or proceeding was inadequate. The second post-conviction proceeding lasted 13 days? Fourteen days. So it was more than twice as long as the trial? Yes, Your Honor. Okay. It was dismissed under 34, I believe, 720. You can summary dismissal if plainly appears from the face. That is not entitled to relief, and that was indicated here. Mr. Madelinsky cites De Feltz saying that you cannot do a summary dismissal, that you have to have the state come back and demand cause and prejudice being shown. However, the forum petition that Madelinsky used provided for him to explain why he was raising the claims again with respect to the new claims and why he had not presented them before. He'd done so. He set forth his cause for filing a successive brief. He said he was unaware previously of some of the issues and wanted to preserve the facts for judicial review. Moreover, the Nevada Supreme Court found the second post-conviction proceeding was a post-conviction proceeding, and that's a matter of state law, which this Court cannot review. And finally, while the second post-conviction proceeding was in process, Feltz was abrogated by the legislature. In terms of the third post-conviction, Mr. Madelinsky argues that the Nevada Supreme Court did not say which claims had been addressed before and which ones were raised for the first time. The Nevada Supreme Court cited to NRS 34-8101B and said Madelinsky had not demonstrated that all the claims in the petition could not have been raised earlier in the proceedings or in a prior petition. All claims are barred by NRS 34-810B. And this Court has previously found NRS 34-8101B independent and adequate. And he acknowledged himself that his petition was successive, and he identified those grounds which he had not presented below. Sotomayor, what is the law of Nevada with regard to the propriety of a trial judge inquiring of a defendant whose counsel has communicated that he's not going to testify, inquiring of the defendant as to whether he, in fact, understands he has the right, it's his right, not counsel's, and so on? Is there any Nevada law on that? I am not certain as to now. And at the time of his trial, which was 1984, there was no requirement that a defendant be advised of his right to testify. He pled guilty in his two prior convictions and guilty pleas ordinarily advise a defendant of his right to testify. He certainly admitted that he discussed testifying with counsel, and he never yelled to the court, hey, listen, I want to testify. He didn't try to get rid of his counsel. So he's, you know, he was silent throughout that. Counsel, under those circumstances where that issue is raised, isn't it incumbent on the government or the state to call defense counsel and at least establish a record on that point? I believe it's the petitioner's responsibility to show that under Strickland, counsel was unreasonable, and the testimony of Madelinsky alone did not say, he sat on me and refused to allow me to testify. He said, I didn't, I wanted to testify, and counsel said don't testify, find somebody else. And as Judge Breen found, it would have been horribly ineffective if he had put Madelinsky on, because in the post-conviction hearing, the state was able to obtain statements from Madelinsky, which indicated that he remembered more than he was claiming to. He remembered beating his wife, Peggy, as she was backing up into the bedroom. He remembers going after her and punching her. He had claimed that he had blacked all of that out, yet the state was able to acquire out of him on cross-examination information that he had claimed he had blacked out. Did the State ever interview post-conviction trial defense counsel? No. The State did not interview the post-conviction counsel. Oh, no. My question was inartful. After the trial was over, but before the post-conviction proceedings began, did the State attempt to interview trial defense counsel? I have no indication in the record that they did. Have they ever? I have no indication in the record that they have. Okay. So to sum up, Mr. Madelinsky was going to be the judge. Counsel, just for my edification, if you had, and Acheson had said I'm not going to talk to you because you're asking me about attorney-client privilege communications and without a waiver from my client I can't answer your questions, what would you be able to do at that point? There would not be much the State could do at that point. It's not until Mr. Madelinsky would have filed a post-conviction petition and started raising ineffective assistance of counsel claims. So your only alternative at that point would be to call him as a witness without knowing what he's going to say. Correctly. Okay. Anything else? No, Your Honor. Just to sum up, Breen found, and those facts have to be given deference, that Mr. Madelinsky, regardless of anything else, could not establish prejudice in this case given the facts. And he was saved from the death penalty. Moreover, NRS 348101B, the procedural default, was correctly applied in this case and was correctly reviewed by the Federal District Court. Okay. Thank you. Thanks for coming in this morning. We'll give you about a minute for rebuttal. Can I have the six minutes she didn't use? Because I didn't get a chance to talk about procedural default. But, anyway, I don't want to be too ---- Your briefs are quite good. Okay. First of all, with regard to Madelinsky and his testimony, he testified the next day, the day after the verdict at his penalty hearing. The first thing out of his mouth was, I wish I'd have been up here testifying in front of you in my guilt phase proceeding. So, you know, and he says, I don't know why I wasn't. To me, that's an indication. I mean, I think he would have said the same thing. Well, no. But, anyway, I'm just trying to paint a clearer picture in terms of time. I heard Ms. Crowe say that the Phelps decision was abrogated by the Nevada legislature during the pendency of post-conviction 2. I don't believe that's accurate. I don't know that she narrowed it quite that much. Has it been abrogated? Oh, yeah. I was on the study commission back in 1990, 1991. Okay. So it was accurate, except that it happened after all the post-conviction proceedings were finished. Phelps was on the books during the very, very brief period of time that PCR 2 was pending, both in the trial court and in the Nevada Supreme Court. And that really is the key in terms of the default argument, because that proceeding cannot be counted as a prior post-conviction relief proceeding. It just can't. Because Nevada violated every rule. It's not the Nevada Supreme Court decision that said that was a valid second post-conviction proceeding. I mean, even if they're wrong, they're still entitled to interpret State law. Not if it's, you know, a question of adequacy. In other words, if they've applied a rule incorrectly or inconsistently is a Federal question under Coleman and under this Court's decision in Collier v. Baer and other default cases. So that's all I'm saying, is you look at that decision and make your own Federal determination as to whether or not it was adequate. And it was a sham. It was just obviously not adequate. And it was the key. It was really the key to this whole post-conviction proceeding, because the State argued throughout in post-conviction 3 that, well, it's just too bad, too bad. Mr. Madelinsky could have done all that in post-conviction 2 but didn't. You know, he asked for a lawyer in post-conviction 2. This is a quirky case. Under Nevada law in Madelinsky's case, he was entitled under a State-given right to the effective assistance of post-conviction counsel. But that gets us into the whole area of whether or not the violation of a State statute can constitute a Federal constitutional violation. I'm talking about it. I'm not even talking about it as an independent Federal claim. I'm talking about it in the context of adequacy. See, and the key to really the reason I'm so passionate about this is if those claims can be revived, there are three or four very important ineffective assistance of appellate counsel. The premeditation and deliberation instruction was bad. And Mr. Acheson objected to that instruction. The Clark County public defender, Ms. McKenna, the only issue she raises on direct appeal in a death penalty case is sufficiency of the evidence, and then she has the temerity to say that this is a no-merit brief. I mean, anybody that's read this record knows that there were seven or eight good issues that could have been raised on appeal that were not. Thank you. Roberts. Thank you. Thank both counsel for coming in this morning. The case just argued will be submitted for decision, and the panel will stand in recess for the day. Thank you, Peter.
judges: Hawkins, Tallman, Singleton